

ORIGINAL

FILED IN CLERK'S OFFICE
U S D C  Atlanta

DEC 29 2006

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION





| | |
|---|---|
| TRIDENT HOLDINGS, LLC and<br>AMERICAN CONSULTING CORPORATION,<br><br>Plaintiffs,<br><br>Vs.<br><br>GREAT WRAPS, INC., MARK KAPLAN,<br>ROBERT SOLOMON, HENRY STRAUSS,<br>KEVIN PARKER, DAN REED, KENNETH<br>CHAMBERS, MIKE ROTONDO, JONATHAN<br>RANDEL AND CHRISTINA KOESTNER,<br><br>Defendants. | **COMPLAINT**<br><br>FILE NO.<br>**1:06-cv-3142**<br><br>**JURY TRIAL<br>DEMANDED**  **JEC** |

## COMPLAINT

Plaintiffs Trident Holdings, LLC and American Consulting Corporation bring

this action seeking damages against Great Wraps, Inc., Mark Kaplan, Robert

Solomon, Henry Strauss, Kevin Parker, Dan Reed, Kenneth Chambers, Mike

Rotondo, Jonathan Randel and Christina Koestner and allege, as follows:

### THE PARTIES, JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332

(diversity of citizenship) based upon the citizenship of the parties being of different

states and the amount in question exceeding the sum or value of $75,000, exclusive of interest and costs.

2.     Plaintiff Trident Holdings, LLC ("Trident") is a California Limited Liability Company, with its place of business located in California.

3.     Plaintiff American Consulting Corporation ("American") is an Illinois corporation with its place of business located in Illinois.

4.     Defendant Great Wraps, Inc. ("Great Wraps") is a Georgia corporation with its place of business located at 4 Executive Park East, Suite 315, Atlanta, Georgia 30329.

5.     Mark Kaplan ("Kaplan") is the Chairman of the Board of Directors, a member of the Board of Directors and an owner of 36% of the shares of stock of Great Wraps, and he is a resident of Georgia.

6.     Robert Solomon ("Solomon") is the President, a member of the Board of Directors and an owner of 36% of the shares of stock of Great Wraps, and he is a resident of Georgia.

7.     Henry Strauss ("Strauss") is a member of the Board of Directors and an owner of 25% of the shares of stock of Great Wraps, and he is a resident of Georgia.

8.     Kevin Parker ("Parker") is the Vice-President of Operations of Great Wraps, and he is a resident of Georgia.

9.     Mike Rotondo ("Rotondo") is the Vice-President of Operations of Great Wraps, and he is a resident of Georgia.

10.     Dan Reed ("Reed") is the Director of Franchise Development of Great Wraps, and he is a resident of Georgia.

11.     Christina Koestner ("Koestner") was the Director of Franchise Development of Great Wraps, and she is a resident of Alabama.

12.     Kenneth Chambers ("Chambers") was the Director of Procurement and Logistics of Great Wraps, and he is a resident of Georgia.

13.     Jonathan Randel ("Randel") is the current Director of Procurement and Logistics of Great Wraps, and he is a resident of Georgia.

14.     This action is also brought under Sections 1 and 2 (plus other applicable sections) of the Sherman Anti-Trust Act, 15 U.S.C. §§1 & 2 (plus other applicable sections); Sections 4 and 16 (plus other applicable sections) of the Clayton Act, 15 U.S.C. §15 and §26 (plus other applicable sections) and the Robinson-Patman Act and 15 U.S.C. §14 and §15 (plus other applicable sections).

15.     This action also includes violations of federal and state franchise laws, breach of contract, violation of the covenant of good faith, fraud and other demands for relief under federal and state laws.

16.     All claims under federal and state law are based upon a common nucleus of operative facts such that the entire action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.

17.     Venue is also proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §15 and §22, under 28 U.S.C. §1391(b)(2) (a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated) and (c) (a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced).

18.     This Court has pendent jurisdiction over the claims based upon State law. 28 U.S.C. §1367(a).     Pendent jurisdiction avoids unnecessary duplication and multiplicity of actions, and should be exercised in the interest of judicial economy, convenience and fairness.

19.     All conditions precedent to filing suit by Plaintiffs have been performed, satisfied, discharged or waived.

## FACTS COMMON TO ALL COUNTS

20.     On or about October 20, 2004, American executed an Area Development Agreement with Great Wraps.

21.     Great Wraps' sale pursuant to its Area Development Agreement is the sale of a franchise to American with its operations located and taking place in the State of Illinois.

22.     On or about February 2004, Parker provided costs as to the operation of a Great Wraps franchise to American by giving same to Kumar Prathipati, president of American ("Prathipati").

23.     On or about February 6, 2004, Parker sent a letter to American offering information and help which showed the cost of a Strip Center Location to be $222,050.00.

24.     On or about October 2004, Koestner confirmed the costs for a new store of a Great Wraps franchise to American by providing to Prathipati the costs previously provided by Parker to Prathipati  in February 2004.

25.     On August 17, 2005, Trident executed an Area Development Agreement with Great Wraps.

26.     Great Wraps' sale pursuant to its Area Development Agreement is the

- 5 -

sale of a franchise to Trident with its operations located and taking place in the State of California.

27.     In June 2005, Reed provided incorrect positive earnings claims as to a Great Wraps franchise to Trident by giving same to Sanjiv Kapur, a managing member of Trident ("Kapur").

28.     On or about June 22, 2005, Parker sent a letter to Trident offering information and help which stated "[y]ou will find attached a store opening timeline and cost details. I've enclosed some of our latest estimates, which will provide you a detailed cost breakdown."

29.     Parker included a sheet which showed the cost of a Strip Center Location to be $228,750.

30.     On or about June 22, 2005, Chambers provided costs as to the operation of a Great Wraps franchise to Trident by giving same to Kapur.

31.     The actual cost of operations was far greater than the cost provided by Great Wraps to Plaintiffs, which made the franchise unprofitable.

32.     Had the actual cost of operations been provided to Plaintiffs, they would not have purchased the franchises.

33.     Since the franchise was unprofitable, due to high cost of operations and

- 6 -

new store construction cost, Plaintiffs' franchisees (Great Wraps' sub-franchisees) refused to open additional stores, which caused a loss of profits to Plaintiffs.

34.     On or about August 19, 2005, just a week after Trident signed the Area Development agreement with Great Wraps, Reed e-mailed a substantially increased "Store Build Out Cost Sheet" which had a much higher number of $196,500.00 to $298,000.00 than what was previously submitted to Trident.

35.     The store build out costs are materially and consistently greater than the amount stated by Great Wraps, making the most conservative business calculation a losing one for the sub-franchisees and thereby impacting the growth and business of Plaintiffs.

36.     The high cost of construction and store operations above what Great Wraps stated would be the case, in and of itself, have prevented Plaintiffs from selling additional franchises.

37.     Upon information and belief, Great Wraps receives consideration from the architects, contractors and equipment suppliers and other vendors with whom Plaintiffs must do business ("Kickbacks").

38.     These Kickbacks are not only improper, but they increase the cost of operations by Plaintiffs.

39.    On or about June 22, 2005, defendants provided incorrect information as to Great Wraps "Real Estate Criteria" for the location of stores to Trident by giving same to Kapur.

40.    In July 2005, Kaplan misrepresented to Trident, through Kapur, the number of franchises that Great Wraps had sold by counting the sales quotas of various Area Developers as "closed sales," resulting in a falsely increased number of Great Wraps franchises.

41.    At a meeting with representatives of Great Wraps on or about July 26, 2005, Great Wraps made several misrepresentations to Trident:

> a. Great Wraps stated it was growing very rapidly and had a history of "20 Years Proven Success" during which the brand, menu, etc. had been perfected into a proven and successful concept.
>
> b. Great Wraps stated that it had an Area Developer for Los Angeles and Ventura counties for over a year and their territory was doing very well and experiencing accelerating growth.
>
> c. Solomon and Kaplan stated to Trident that they have visited the Southern California territory and mentioned how great a promise California offered.

d. Kaplan implied that it was safe to assume that the stores did $550,000.00 annually. Kaplan went on to say that such an assumption "would not be out of line" and Trident could do much better in Southern California due to its affluent demographics and population densities as well as the fact that Great Wraps will be more popular there.

e. Kaplan made an earnings claim by stating that the purchase of a Great Wraps franchise would have to be immediately made "if we were to make any real money or the train would leave the station."

42. Great Wraps Uniform Franchise Offering Circular ("UFOC") specifically states in Item 19 that Great Wraps does not provide earnings claims ("No Earnings Claims Policy").

43. Annual store sales in Trident's territory are below $290,000.00.

44. The Area Development Agreement stipulated that Trident build a store within ten months of the signing of the Area Development Agreement.

45. Great Wraps knew that it was virtually impossible to build a store within ten months of signing of Area Development Agreement.

46. Great Wraps was required to register Trident with the California

- 9 -

Department of Corporations prior to selling franchises in the State of California.

47.     Great Wraps never stated there would be a delay to Trident being able to sell franchises and comply with the terms of the Area Developer Agreement due to registration required with the State of California.

48.     Trident kept requesting Great Wraps to expedite the franchise registration process with the State of California, which was not done.

49.     Great Wraps waited two weeks to start the franchise registration process after Trident signed the Area Developer Agreement causing an additional delay.

50.     The franchise registration process for Trident took Great Wraps more than seven weeks to be completed.

51.     On or about August 23, 2005, Reed e-mailed Trident saying Trident could not sell Great Wraps franchises until Great Wraps' franchise lawyer registered Trident with the State of California.

52.     On or about November 14, 2005, an e-mail was sent by Trident to Gene Combs, Real Estate consultant of Great Wraps and Trident's commercial broker, requesting help in selecting/signing four to five leases to open Trident owned stores, including finding locations for Trident's franchisees.

53.     Great Wraps knew it would take much longer to find potentially good

- 10 -

sites in Southern California because its commercial real estate market was in huge demand and competition for food locations among various brands trying to gain a footprint in Southern California was very intense.

54.    Great Wraps knew that almost any good site would not be available for months if not years out into the future.

55.    Great Wraps knew that Trident could not meet the stipulated store opening schedule in any territory.

56.    Upon information and belief, none of the Great Wraps area developers have met the store opening schedule.

57.    Great Wraps knew about the nature of the commercial real estate market as they had had an Area Developer in Los Angeles and Ventura Counties for over two years.

58.    Great Wraps incorporation of the requirement that Plaintiffs were each obligated to open a corporate store within ten months of its execution could not be met.

59.    Great Wraps was required to register American with the Illinois Attorney General prior to selling franchises in the State of Illinois.

60.    Great Wraps never stated there would be a delay to American being able

to sell franchises and comply with the terms of the Area Developer Agreement due to registration required with the State of Illinois.

61.    American repeatedly requested Great Wraps to expedite the franchise registration process with the State of Illinois, which was not done.

62.    The franchise registration process for American took Great Wraps more than thirteen weeks to be completed.

63.    American lost sales and the ability to comply with the Area Developer Agreement due to Great Wraps' actions and inactions.

64.    Great Wraps intended to create a situation in which Plaintiffs could not comply with the terms of the Area Developer Agreement.

65.    On or about June 22, 2005, Robert Saade ("Saade"), the Director of Operations and Training of Great Wraps provided incorrect information as to the training that would be provided by Great Wraps to Trident by giving same to Kapur.

66.    Great Wraps stated the training period for franchisees would be fifteen days.

67.    Franchisees being trained had to pay for their transportation, lodging and food.

68.    Great Wraps raised the required amount of training to three weeks

without prior consent from Trident.

69.     On or about June 22, 2005, Saade stated that Great Wraps would provide "hands-on assistance with training for major product changes and new product rollouts."

70.     Great Wraps did not provide the promised assistance as to the training.

71.     Great Wraps assured Plaintiffs that their staff were committed to making Great Wraps concept successful and supporting the Area Developers.

72.     This assurance was false as the same Great Wraps corporate team was heavily utilized to develop and support "TJs Subs" franchise concept.

73.     Kaplan drew heavily from these staff members who were critical to the day to day sustenance of the Great Wraps' franchise system.

74.     Great Wraps withheld the information from Plaintiffs that Great Wraps intended to divert substantial Great Wraps' resources from the Great Wraps' franchise into developing and supporting other franchise concepts.

75.     There is no store in Plaintiffs' territory that comes close to the sales volumes that Great Wraps stated and/or implied would be met, even though each location was approved by Great Wraps.

76.     The costs that Great Wraps stated would be incurred in starting a

- 13 -

franchise have greatly exceeded the amount stated in Great Wraps' UFOC.

77.     The store locations approved by Great Wraps were improper for Plaintiffs' franchisees.

78.     Great Wraps' miscalculations have forced Plaintiffs' franchisees to borrow more and pay higher loan payments severely affecting their profitability and sustainability.

79.     Plaintiffs' franchisees who promised to open additional stores changed their intention due to Great Wraps' actions and inactions.

80.     Great Wraps' miscalculations and lack of response have forced Plaintiffs to greatly increase the amount of time and resources they have to spend with their franchisees, reducing their profits.

81.     Great Wraps' approved food vendor lacked service and support, and the approved food vendor constantly changed its prices and policies.

82.     The food vendor's than projected food costs has hurt Plaintiffs' franchisees.

83.     The food vendor, delivery, price and quality issues have remained unresolved.

84.     This has hurt Plaintiffs' business as franchisees are shutting down, selling

- 14 -

their stores, asking for refunds of franchise fees and refusing to build franchises bought by them.

85.     On or about October 2, 2006, Solomon quoted to one of American's franchisees as follows: "[c]ertainly, you understand there is no current advertising pool. You do not pay for advertising, as you would with Jimmy John's, Quiznos or other concepts. The 0.5% royalty that you pay goes toward graphics and design for the system wide promotions."

86.     Great Wraps failed to use the marketing fee as promised.

87.     The costs incurred by Plaintiffs' franchisees exceeded the amounts that Great Wraps stated would be incurred.

88.     As a consequence of dwindling franchisee support on the part of Great Wraps, there was a dramatic system-wide fall in franchise sales, adding to the ever growing list of franchisees not making any significant profits.

89.     Despite the protests by franchisees, Great Wraps proceeded to embark on a path whereby they changed logos, store colors, layouts, menu selection, menu items, etc. and made matters worse for all the franchisees system-wide.

90.     On or about September 6, 2005, Trident was told that a potential franchisee, Milad Faragala, was referred to Brent Rowe of Franchise- Finance.

91.     Trident was told that Great Wraps worked closely with Brent Rowe of Franchise-Finance.

92.     Trident found out that potential franchisees, which were not qualified to afford a franchise the size/cost of Great Wraps, were routed to Brent Rowe who would often suggest to the potential franchisees to take out a home equity loan, deposit it in their bank, wait three months and then Brent Rowe would process their loan application.

93.     This way the deposited money would be accounted in the liquid assets category instead of it actually being a loan/liability on the applicant's financial application for the loan.

94.     Plaintiffs have not been paid their due share of royalty fees by Great Wraps as required by contract.

95.     In August 2005, Trident requested brochures and business cards from Great Wraps.

96.     Despite multiple complaints and calls by Trident to Great Wraps that Trident could not commence its day to day operations without the requested brochures and business cards, Great Wraps failed to timely provide the brochures and business cards.

- 16 -

97.     On or about September 2, 2005, Great Wraps e-mailed the site selection criteria to Trident.

98.     The criteria were so impractical that no one could find any acceptable site which met the criteria.

99.     On or about September 7, 2005, Trident e-mailed Solomon to get information and sales figures for Great Wraps to provide them to The Irvine Company, a large and reputable landlord in Southern California.

100.    The Irvine Company was known for being particular about selecting good, profitable and successful food franchises for its properties.

101.    Despite Trident's phone calls and e-mail to Solomon, Trident did not receive a response from Great Wraps.

102.    On or about February 14, 2006, Solomon stated in the e-mail that a Great Wraps strip center store did revenues around $350,000.00 a year.

103.    The sales volume disclosed by Solomon in the e-mail on or about February 14, 2006, contradicted the information previously provided to Trident.

104.    The sales revenues of $350,000.00 for a strip center location made Great Wraps' franchises unprofitable to Trident and its franchisees.

105.    Trident's efforts in opening the door to potentially profitable locations for

its franchisees were negatively affected, and Trident was not offered space by the landlord.

106.   Great Wraps improperly refused to provide the required assistance in finding locations for franchisees.

107.   On or about November 18, 2005, Trident e-mailed Great Wraps requesting help in store marketing, coupons, etc.

108.   When Great Wraps was pressed to contribute towards local marketing efforts from the 0.5% advertising fee Great Wraps collected from its franchisees, Trident's request was refused.

109.   On or about March 17, 2006 Trident began informing Great Wraps in a series of e-mails of a litany of problems, challenges and issues Trident and its franchisees were facing, such as problems with, *inter alia*, food quality, food pricing, food vendors, food delivery and other related issues.   Trident continued to inform Great Wraps of the litany of problems through September 2006.

110.   Great Wraps failure to provide consistent support critical to the success of Area Developers and franchisees created ill will amongst the franchisees.

111.   Such antagonistic feelings severely restricted Trident from culminating any sales of Great Wraps franchises as none of the existing franchisees were providing

- 18 -

any good references to the prospective Great Wraps franchisees.

112.   As a result, new franchise sales plummeted for Trident.

113.   Great Wraps took no effective action to alleviate the enumerated problems, causing operational problems, negatively affecting profitability and causing lost sales of franchises.

114.   As of June 29, 2006, Trident had been requesting for months for Randel to provide a marketing package which Trident could present Great Wraps as a potentially promising tenant to major landlords, property managers and shopping centers/malls.

115.   This information was critical in attracting attention of the landlords to Great Wraps such that Trident could help its franchisees secure potentially great locations/sites for their Great Wraps' stores.

116.   This information was not timely supplied by Great Wraps.

117.   On or about July 5, 2006, Trident learned that each store opening was being assisted by two persons from Great Wraps traveling to the respective store locations, one for ten days and the other for seven.

118.   Great Wraps had promised to send its personnel for franchise store openings for a period of two weeks.

119.   Great Wraps was not living up to this promise to its franchisees, in violation of its obligations, and Great Wraps was allowing their franchise stores to open with less training than promised, potentially having under-trained franchisees in the system.

120.   On or about November 7, 2006, matters had gotten so serious that Trident e-mailed Solomon and Kaplan requesting a meeting in their offices in Atlanta.

121.   Trident also offered to meet with Randel in Southern California during his visit there.

122.   Randel never responded to Trident's offer.

123.   Trident stated to Great Wraps that things were coming to a point whereby a face-to-face meeting had to occur to convey and convince Great Wraps that they needed to fix the problems within their system or implosion of Great Wraps would become a distinct possibility.

124.   Trident communicated with Great Wraps requesting it to fix the communication problems as well as set up a protocol to keep Trident informed and included in the process of supporting its territory as well as protecting and promoting its business interests therein.

125.   When Trident mentioned its concerns to Great Wraps, its two executives

(Kaplan & Solomon) verbally assured Trident that the delays and short-comings were a positive sign of "growing pains."

126.   Trident informed Great Wraps that Great Wraps' problems in communication and franchise support issues could cause enough challenges that Trident might not be able to achieve the milestones set forth in the Area Development Agreement and that these problems in combination with certain other factors could expose Trident to the technical default of some of the requirements contained in the Area Developer agreement.

127.   Great Wraps stated that it would not impose the time factors stated within the Area Development Agreement as Great Wraps was aware of the challenges Plaintiffs was facing.

128.   Great Wraps lacked corporate coordination to service its franchisees including their Area Developers.

129.   Great Wraps was severely under-staffed to provide the level of support the franchisees were promised, expected, deserved and needed.

130.   On or about January 30, 2004, Koestner mailed a letter assuring American that Great Wraps would help find "successful locations within 4-6 months otherwise Great Wraps will gladly terminate the agreement and refund all the money

- 21 -

whenever you want" by giving same to Kumar Prathipati, the president and co-owner of American.

131.   American was made to understand that such an offer would be honored even after the store opened.

132.   This assurance or promise to "return the franchisee fee" was unilaterally cancelled by Great Wraps without consent or consultation with American in mid-2005.

133.   This action on the part of Great Wraps adversely affected franchise sales of American, as a number of potential franchisees refused to buy.

134.   On or about February 2004, Koestner provided costs as to the operation of a Great Wraps franchise to American by giving same to Prathipati.

135.   On or about February 6, 2004, Parker sent a letter to American offering information and help which showed the cost of a Strip Center Location to be $222,050.00.

136.   On or about March 2004, Kaplan provided incorrect positive earnings claims as to a Great Wraps franchise to American by giving same to Prathipati on his visit to Atlanta office of Great Wraps.

137.   These costs were materially less than the true costs.

138.   On or about March 3, 2004, Kaplan stated in his office to American that an average Great Wraps store did $400,000.00 annually.

139.   Kaplan also stated since Great Wraps had a proven "Real Estate Criteria" and would approve of each location, American could be assured of success.

140.   Currently all six store locations within American's territory have been approved by Great Wraps.

141.   These six stores average $220,000.00 annually, far lower than Great Wraps stated would be the case.

142.   These low average sales numbers have hurt American's ability to sell additional franchises.

143.   One store shut down in September 2006 due to heavy financial losses.

144.   On or about March 5, 2004, Kaplan stated to American, "[w]e are not convinced on selling the Chicago rights because we're getting such strong interest from the market." Furthermore he stated in the e-mail that "Chicago could support at least 50 stores in the next 5 years."

145.   Koestner followed up this e-mail via a phone call saying that if American decided quickly Great Wraps would require American to open only half of the 50 stores in the next five years as Kaplan stated in the e-mail.

146.   Great Wraps did not disclose to American that it was being investigated by the Office of Attorney General of the State of Illinois.

147.   Great Wraps did not disclose to American that one of the Great Wraps' franchisees was incurring heavy financial losses.

148.   One reason the franchisee incurred such heavy financial losses was due to Great Wraps approving a poor location for the store.

149.   That store location shut down within fifteen months after opening.

150.   Had Great Wraps made these disclosures American would not have purchased the Area Development Agreement.

151.   Great Wraps provided to American a range of costs as to the operation of its franchises.

152.   The actual cost of operations was far greater than the cost provided by Great Wraps to American, which made the franchise unprofitable.

153.   Since the franchise was unprofitable, due to high cost of operations and new store construction cost, American's franchisees (Great Wraps' sub-franchisees) refused to open additional stores, which caused loss of profits to American.

154.   The high cost of construction and store operations above what Great Wraps stated would be the case, in and of itself have prevented American from selling

additional franchises.

155.   Actual store build out costs are materially and consistently greater than the amount stated by Great Wraps, making even the most conservative business calculation a losing one for the sub-franchisees and thereby impacting the growth and business of Plaintiffs.

156.   Great Wraps misrepresented to American and said it was growing very rapidly and had a history of "20 Years Proven Success" during which the brand, menu, etc. had been perfected into a proven and successful concept.

157.   Great Wraps is not a proven successful concept as they claimed.

158.   The Area Development Agreement stipulated that American build a store within eight months of the signing of the Area Development Agreement.

159.   Great Wraps knew that it was virtually impossible to build a viable store within ten months of signing of the Area Development Agreement.

160.   Section 2.1 of the Area Development Agreement contains a schedule for the sale of franchises that Great Wraps knew American could not meet.  This was tantamount to setting up Plaintiffs for default.

161.   Great Wraps presented a far rosier business outlook than was factual and willfully withheld important information that would have enabled Plaintiffs to

accurately assess the risk and reward of signing a Great Wraps Area Development Agreement

162.    Great Wraps intended to create a situation in which Plaintiffs could not comply with the terms of the Area Development Agreement.

163.    On or about February 5, 2006, Solomon e-mailed American's franchisee instructing it to use the Great Wraps approved architect.

164.    The approved architect was clearly notified of the relevant deadline. The delivery by the architect was three months late.

165.    Due to this late delivery, American's franchisee suffered a loss of $40,000.00 even before the store had opened for business.

166.    Due to Great Wraps' intentional misrepresentation of store operating costs, the franchisee's losses were never recovered.

167.    On or about April 26, 2006, American's franchisee requested from Great Wraps a list of approved vendors.

168.    American's franchisee selected a vendor that made the most business sense.

169.    Chambers rejected the franchisee's chosen vendor.

170.    The lack of direction by Chambers reflected negatively on American's

ability to serve its sub-franchisees.

171.   The facts and issues of each plaintiff apply to the other plaintiff as to their relationship with and the actions and inactions of defendants.

## FIRST COUNT
### (Breach of the Area Development Agreement- Great Wraps)

172.   Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 171 stated above as if fully set forth herein.

173.   Great Wraps breached its Area Development Agreement by changing the amount of training time that would be required to be taken by Plaintiffs and their franchisees.

174.   Great Wraps breached Area Development Agreement by not providing hands-on assistance with training for product changes and new product rollouts.

175.   Great Wraps breached its contract by failing to provide the appropriate support to Plaintiffs.

176.   Great Wraps breached its contract by failing to provide the appropriate support to Plaintiffs' franchisees.

177.   Great Wraps breached Area Development Agreement by charging more to Plaintiffs for fees than it stated it would.

178.   Great Wraps breached sections 3.6 and 6.1 of the Area Development

Agreement by not spending the 0.5% marketing fee collected for the intended purpose and by failing to offer Plaintiffs any marketing or advertising support to specifically help the Plaintiffs' franchisees.

179.   Great Wraps breached sections 3.2 and 6.2 of the Area Development Agreement by increasing its franchise fee.

180.   Great Wraps breached section 3.3 of the Area Developer Agreement by underpaying the royalty fee to the Plaintiffs.

181.   Great Wraps breached section 6.1 of the Area Development Agreement by increasing the required training time.

182.   Great Wraps breached sections 3.6 and 6.1 of the Area Development Agreement by saying that Plaintiffs were responsible for store marketing, coupons, etc.

183.   Great Wraps breached sections 3.6, 6.1 and 6.2 of the Area Development Agreement by stating that Great Wraps did not have a large enough presence in California to warrant any marketing and that marketing in California would not be possible because of the media costs in such an expensive media market.

184.   Great Wraps breached sections 6.1 and 6.2 of the Area Development Agreement by failing to address and fix ongoing problems such as, *inter alia*, food

quality, food pricing, food vendor and food delivery.

185.   Great Wraps breached the Area Development Agreement by failing to deliver its obligations as required by the agreement, setting a low bar for its team performing its services and holding Plaintiffs to deliver on strict terms as stated in the Area Development Agreement.

186.   On or about July 25, 2006, Solomon asked American to assist in the sale of a franchisee's store, withholding information pertaining to its unviable location.

187.   Great Wraps breached sections 6.1 and 6.2 of the Area Development Agreement as to American because on or about August 29, 2006, Solomon had offered to buy the store from American's franchisee circumventing American in exchange for indemnification of any wrong doing by Great Wraps.

188.   As a result of Great Wraps' breaches of the Area Development Agreement, Plaintiffs have been injured in its business and property in an amount in excess of $75,000.00.

189.   Plaintiffs are entitled to their costs, expenses and reasonable attorneys' fees incurred in investigating, prosecuting and defending their actions with regard to Great Wraps pursuant to section 10.7 of the Area Development Agreement.

## SECOND COUNT
### (Breach of the Covenant of Good Faith- Great Wraps)

190.   Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 171 stated above as if fully set forth herein.

191.   The actions of defendants stated in paragraphs 1 through 171 stated above constitute a breach of the covenant of good faith and fair dealing.

192.   As a result of Great Wraps' actions and/or inactions, Plaintiffs have been injured in its business and property in an amount in excess of $75,000.00.

## THIRD COUNT
### (Fraud- Great Wraps)

193.   Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 171 stated above as if fully set forth herein.

194.   Great Wraps, through its officers and directors made material misrepresentations to Plaintiffs.

195.   Plaintiffs reasonably relied on the misrepresentations made by Great Wraps.

196.   As a result of Great Wraps' fraud, Plaintiffs have been injured in its business and property in an amount in excess of $75,000.00.

197.   Defendants have exhibited willful misconduct, malice, fraud,

wantonness, oppression and/or that entire want of care which would raise the presumption of conscious indifference to consequences within the meaning of O.C.G.A. § 51-12-5.1(b).    Therefore, Plaintiffs are entitled to recover both compensatory and punitive damages in an amount in excess of $75,000.00.

## FOURTH COUNT
### (Violation of the California Franchise Investment Law as to Trident- All defendants)

198.   Trident hereby realleges and incorporates by reference paragraphs 1 through 171 stated above as if fully set forth herein.

199.   As stated in California Civil Code ("CCC") §§31001 and 31105, the protections of the California Franchise Investment Law apply to all franchisees located in the State of California.

200.   Trident is located in the State of California and therefore the protections of the California Franchise Investment Law apply to Trident.

201.   Defendant's business is a franchise pursuant to CCC §31005 and is liable pursuant to the provisions of the California Franchise Investment Law.

202.   CCC §31012 states that "fraud" and "deceit" are not limited to common law fraud or deceit.

203.   Greats Wraps offered and sold the franchise to Trident in the State of

California pursuant to CCC §31013.

204.   Defendants made an offer to sell a franchise in the State of California as defined in CCC §31013 and §31018 and are therefore subject to the provisions of the California Franchise Investment Law.

205.   Defendants violated CCC §31200 by making an untrue statement of a material fact in its UFOC.

206.   Defendants violated CCC §31201 by making an untrue statement of a material fact or omitted a material fact to Trident.

207.   Pursuant to CCC §31300 Trident is entitled to rescission of any agreement with Great Wraps.

208.   Pursuant to CCC §31301 Trident is entitled to damages.

209.   Pursuant to CCC §31302 the individual defendants are personally liable for all damages in this Count.

210.   As a result of Great Wraps' actions and/or inactions, Trident has been injured in its business and property in an amount in excess of $75,000.00.

## FIFTH COUNT
### (Violation of the Sherman Anti-Trust Act- Great Wraps)

211.   Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 171 stated above as if fully set forth herein.

212. The numerous aspects of Great Wraps' operation as stated by Great Wraps is a unique combination of products, services, layout, color scheme, décor, signage, trademarks, a distinctive method and procedure for the preparation and serving of food and beverage products, special ingredients, unique and secret recipes for food products and distinctive service accessories, including, but not limited to uniforms, logos, trade dress, menus, packages, containers and similar paper or plastic goods, efficient methods of achieving quality and quantity control and service, standard form plans and specifications for distinctive, standardized premises and characteristic interior and exterior style, design, decor, furnishings, food photography, graphics, equipment layout, and interior and exterior signs, a unique method of operating Great Wraps Restaurants which is described in its confidential "Operations Manual," valuable trade names, trademarks and service marks, including but not limited to "Great Wraps," a public image that each Restaurant is a unit in an established franchise system and that all Restaurants are operated with uniform standards of service and product quality and quantity that differentiates it from other providers of fast food restaurants ("Unique Services").

213. Great Wraps is the only company that provides the Unique Services and has control of 100% of the market for the Unique Services.

– 33 –

214.   Great Wraps' actions include improper pricing as to its franchisees, Plaintiffs and the public, restrictions on purchases and sales by its franchisees and Plaintiffs, and restrictions on the method by which its franchisees and Plaintiffs must conduct business with the intent and result of creating a monopoly.

215.   Great Wraps shows an interstate presence, a "not insubstantial" amount of interstate commerce being affected by Great Wraps and its monopoly power extending in interstate commerce beyond the States of California and Illinois, which places the burden on Great Wraps to show that its dominance is due to skill, acumen and the like.

216.   Great Wraps has monopoly power in the market as to its pricing policies to franchisees and the public, franchise matters and all other aspects regarding its operations in the State of California and Illinois and in interstate commerce.

217.   This has allowed Great Wraps to act in a monopolistic manner, charge monopoly prices for its franchises, force franchisees and Plaintiffs to pay higher prices for goods and services supplied by Great Wraps and its suppliers, force its franchisees to charge higher prices to the public, engage in improper pricing of the delivery and providing of goods and services to its franchisees, Plaintiffs and the public, provide a nexus by which Great Wraps has acted in a monopolistic manner and has allowed

Great Wraps to monopolize the market in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§1 and 2.

218.   Great Wraps conditioned the sale of its franchise to Plaintiffs based on Plaintiffs' agreement to sell franchises using Great Wraps Franchise Agreement ("Franchise Agreement").

219.   The Franchise Agreement states in paragraph 11.4 that franchisees must use architects and contractors specified by Great Wraps.

220.   These services could have been purchased on the open market at prices lower than that charged by Great Wraps' designees.

221.   The Franchise Agreement states in paragraphs 11.8 and 11.9 that franchisees must use suppliers specified by Great Wraps.

222.   These supplies could have been purchased on the open market at prices lower than that charged by Great Wraps' designees.

223.   The Franchise Agreement states in paragraph 11.12 that franchisees must use the uniforms specified by Great Wraps.

224.   These uniforms could have been purchased on the open market at prices lower than that charged by Great Wraps' designees.

225.   The Franchise Agreement states in paragraph 11.12 that it is prohibited to sell products at wholesale or for resale.

226.   Great Wraps failed to walk the narrow path required of Great Wraps when it included the requirements to purchase from specific suppliers ("Narrow Path Failure").

227.   Great Wraps' tying arrangements in its Narrow Path Failure constitutes a *per se* violation of the Sherman Act.  Therefore Plaintiffs need not demonstrate that the effects of the tie are unreasonable; Great Wraps is not free to demonstrate that the effects are reasonable or even affirmatively desirable; the competitive impact of the arrangement simply is not an issue for trial and a finding that Great Wraps' conduct falls within the category of *per se* tying arrangements disposes of the case in the Plaintiffs' favor.

228.   Great Wraps would not permit Plaintiffs to purchase goods and services on the open market that were the same or superior quality and at a lower price to what Great Wraps forced Plaintiffs to purchase, which resulted in higher costs for Plaintiffs and the public.

229.   Great Wraps violated Section 1 of the Sherman Act by the illegal "tying arrangement" of Great Wraps exploiting its control over a "tying product" (the

franchise, which included the use of Great Wraps' trademarks, whose use by Plaintiffs is permitted by paragraph 7.11 of the Area Development Agreement).

230.  Great Wraps had and has market power to force Plaintiffs to accept the tied products to force Plaintiffs (which complied reluctantly and because of the fear of retaliation by Great Wraps) to purchase a "tied product" (all products and services Plaintiffs were required to purchase from Great Wraps, its suppliers and contractors with which Plaintiffs were forced to do business) that Plaintiffs either did not want at all, or might have preferred to purchase elsewhere on different terms.

231.  Great Wraps' conduct is illegal as a *per se* violation of the Sherman Act based upon Great Wraps' economic power in its market which involved a "not insubstantial" amount of interstate commerce in the tied product market.

232.  Great Wraps has never allowed Plaintiffs to purchase the products (which were and are of a generic type and quality for which there is no reason for Great Wraps to limit Plaintiffs' choice of supplier) from any business not on its approved list presented to Plaintiffs.

233.  The disparity in economic power between Great Wraps and Plaintiffs renders the situation inherently coercive, which invokes the *per se* doctrine.

234.   Great Wraps coerced Plaintiffs into purchasing the supplies and products in question from it and the vendors it required Plaintiffs to use.

235.   This coercion consisted of both the Great Wraps-franchisee relationship and actual coercion on the part of Great Wraps, which invokes the *per se* doctrine.

236.   Based upon the generic type of goods involved, there was no need to specify approved suppliers to control the quality of the end product sold to the consuming public, specifications for a substitute would not be detailed and they could be practicably be supplied, the tying imposed by Great Wraps does not impose the least burden on commerce and the burden of proof on this issue rests with Great Wraps seeking to justify the tie, which is a heavy one.

237.   Great Wraps' illegal tying actions have both effectively and actually excluded suppliers from the market thus hurting competition, having the effect of stifling competition and harming both Plaintiffs and the public.

238.   Great Wraps' illegal tying actions have resulted in a foreclosure of choice to Plaintiffs and the ultimate consumer.  Plaintiffs cannot purchase the goods and services separately, which has resulted from Great Wraps' anticompetitive effect based upon its illegal tying conduct in the market and the sub-market and Great

- 38 -

Wraps' conduct has caused consumers to pay higher prices and resulted in a dilution in product quality and service.

239. Paragraph 11.10 of the Franchise Agreement provides for mandatory products and services Plaintiffs are required to sell ("Mandatory Requirements"), which improperly limited the goods and services that Plaintiffs can use in the operation of its franchise.

240. Great Wraps refused to allow Plaintiffs to sell at wholesale or for resale as stated in paragraph 12 of the Franchise Agreement, which caused consumers to pay more for these services, which is a *per se* violation of the Sherman Act.

241. Great Wraps has the ability to affect the price and/or output of the services provided by Plaintiffs based upon the goods and services Plaintiffs were required to purchase from Great Wraps.

242. The exclusion of Plaintiffs from the marketplace at the price Plaintiffs wished to charge affected or was intended to affect the price and/or output of the services provided by Plaintiffs based upon the goods provided by Great Wraps to Plaintiffs, which hurt the ultimate consumer.

243. Great Wraps' actions have affected Plaintiffs and the consumers in the State of California and Illinois and interstate commerce, have and will continue to

have a substantial effect on interstate trade, have the effect of stifling competition and commerce and have unreasonably restrained, will continue to restrain interstate trade and commerce and result in higher costs for Plaintiffs, franchisees and consumers.

244.   Great Wraps' agreement and conspiracy as to the suppliers and sellers with which Plaintiffs were required to do business and Great Wraps' improper goals of monopolization and restraining competition through fraud, deception and misuse of monopoly profits constitutes a violation of the Sherman Act.

245.   There was and is no valid reason for Great Wraps to deny Plaintiffs the ability to purchase both goods and services of suppliers not approved by Great Wraps' if they are of the same or superior quality to the goods and services required to be purchased from Great Wraps' suppliers.

246.   The geographic market in this case is the states of California and Illinois.

247.   Due to the provisions of the Franchise Agreement between Plaintiffs and Great Wraps, Great Wraps had the ability to affect the amount of services offered and/or provided by Plaintiffs.

248.   Great Wraps violated the "Rule of Reason" anti-trust test in that Great Wraps contracted, combined and conspired with each other and their suppliers who owned companies with which Plaintiffs were required to directly do business, which

produced the higher prices and other anti-competitive effects stated in this Count

within the market stated in this Count in interstate commerce, which caused the illegal

acts stated in this Count, all of which were the proximate cause of Plaintiffs' higher,

unnecessary and improper costs, expenses and losses and higher costs to consumers.

249.   The actions of Great Wraps was designed to affect the supply of goods

and services offered and/or provided by Plaintiffs which has resulted in Great Wraps

having monopolized, or attempted to monopolize, or combine or conspire with any

other person or persons, to monopolize any part of the trade or commerce among the

several States in violation of Sections 1 and 2 of the Sherman Anti-Trust Act (15

U.S.C. §§1 & 2).

250.   Great Wraps' conduct amounts to willful maintenance of its monopoly

power in the market for its services, and constitutes unlawful monopolization in

interstate commerce in violation of Sections 1 and 2 of the Sherman Anti-Trust Act

(15 U.S.C. §§1 & 2).

251.   Plaintiffs were required to retain legal counsel to vindicate their rights

and are entitled to recover their legal fees pursuant to this statute.

252.   As a direct and proximate result of the foregoing, Plaintiffs have been

injured in their business and property, are threatened with immediate and irreparable

additional loss and damage and will continue to be so threatened unless Great Wraps is forced to compensate Plaintiffs for their losses.

253.   As a result of Great Wraps' actions and violations of the law, Plaintiffs have been injured in their business and property in an amount in excess of $75,000.00.

254.   Pursuant to 15 U.S.C. §15, Plaintiffs are entitled to recover threefold damages by them and the cost of suit, including a reasonable attorney's fee.

### SIXTH COUNT
### (Violation of the Clayton Act- Great Wraps)

255.   Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 171 stated above as if fully set forth herein.

256.   By engaging in the acts stated in enumerated paragraphs 1 through 171, Great Wraps lessened competition and/or tended to create a monopoly in the business in which Great Wraps operates and/or injured and/or prevented competition with itself, other franchisees and/or companies owned directly or indirectly by Great Wraps.

257.   Great Wraps engaged in an invalid "tying arrangement" in which Great Wraps exploited its control over the purchase of the franchise by Plaintiffs to force Plaintiffs to purchase the goods and services required for the operation of the franchise from Great Wraps and/or other mandated sellers and suppliers.

258.   Plaintiffs preferred to purchase these goods and services from suppliers on different terms and lower prices, which was refused by Great Wraps.

259.   Great Wraps' actions increased the likelihood that customers will pay higher prices by eliminating actual, direct and substantial competition in the relevant market between companies the Great Wraps requires Plaintiffs and its franchisees to deal with and others which are capable of supply the same goods and services.

260.   Great Wraps' actions harmed both Plaintiffs and the general public, reduced competition, had the effect of stifling competition and increased the likelihood of unilateral anti-competitive effects in the relevant market.

261.   By engaging in the restrictions on the purchases and sales in which Great Wraps would not allow Plaintiffs to deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors, Great Wraps violated the Clayton Act (15 U.S.C. §§14).

262.   Plaintiffs were denied the profits they would have made had Great Wraps not engaged in the actions and activities prohibited by Clayton Act, were required to retain legal counsel to vindicate their rights and are entitled to recover their legal fees pursuant to this statute.

263.   As a direct and proximate result of the foregoing, Plaintiffs have been injured in their business and property, are threatened with immediate and irreparable additional loss and damage and will continue to be so threatened unless Great Wraps is forced to compensate Plaintiffs for their losses.

264.   As a result of Great Wraps' actions and violations of the law, Plaintiffs have been injured in their business and property in an amount in excess of $75,000.00.

265.   Pursuant to 15 U.S.C. §15, Plaintiffs are entitled to recover threefold damages by them and the cost of suit, including a reasonable attorney's fee.

### SEVENTH COUNT
### (Violation of the Robinson-Patman Act- Great Wraps)

266.   Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 171 stated above as if fully set forth herein.

267.   As a condition of Plaintiffs to purchase a franchise from Great Wraps they were required to purchase the approved products and goods from Great Wraps or its approved supplier, which constitutes an illegal tying as defined by the Robinson-Patman Act.

268.   Plaintiffs could have purchased equal or higher quality goods on the open market at prices lower than that charged by Great Wraps, which action increased the costs to Plaintiffs and consumers.

- 44 -

269.    The tied products were purchased from Great Wraps and its suppliers only reluctantly by Plaintiffs because of the fear of franchise termination.

270.    Great Wraps failed to show that its interest in ensuring product quality and protecting its trademarks' goodwill would not be adequately protected by product specifications.

271.    Great Wraps' discriminatory practices injured competition, harmed Plaintiffs and the public and violated the Robinson-Patman Act since Great Wraps' actions required Plaintiffs to charge higher prices for its services to the public in order to cover its higher costs due to the forced purchase the tied products ("Higher Costs").

272.    The Higher Costs and the other improper actions of Great Wraps engaging in the actions and activities prohibited by Robinson-Patman Act resulted in Plaintiffs sustaining actual economic injury as a result of the Great Wraps' conduct including lost sales and profits as well as higher costs and expenses to the public.

273.    Great Wraps engaged in an illegal tying arrangement prohibited by Robinson-Patman Act (15 U.S.C. §1 *et seq.*, specifically §14) by discriminating against Plaintiffs in prices charged and discounts offered.

274.    As a result of Defendants' (based upon their personal profit as a result of their conspiracy and collective work with each other concerning these matters) actions

- 45 -

and violations of the law, Plaintiffs have been injured in their business and property in an amount in excess of $75,000.00.

275.    Plaintiffs were required to retain legal counsel to vindicate their rights, are entitled to recover their legal fees pursuant to this statute and are entitled to recover threefold damages and the cost of suit, including a reasonable attorney's fee. 15 U.S.C. §15.

### EIGHTH COUNT
### (Expenses of Litigation)

276.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 171, as if fully set forth herein.

277.    Defendants have acted in bad faith, been stubbornly litigious and/or caused Plaintiffs unnecessary trouble and expense, entitling trident to recover its expenses of litigation, including its reasonable attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants for:

(a)    Compensatory damages for Defendant Great Wraps' breach of contract, plus pre-judgment interest and post-judgment interest at the highest rate allowed by law;

(b)    Compensatory damages for Defendant Great Wraps' breach of the covenant of good faith, plus pre-judgment interest and post-judgment interest at the highest rate allowed by law;

(c)    Compensatory damages for Defendant Great Wraps' fraud, plus pre-judgment interest and post-judgment interest at the highest rate allowed by law;

(d)    Punitive damages for Great Wraps' fraud;

(e)    Damages for the Defendants' violation of the California Franchise Investment Law;

(f)    Damages for Defendant Great Wraps' violation of the Sherman Anti-Trust Act;

(g)    Damages for Defendant Great Wraps' violation of the Clayton Act;

(h)    Damages for Defendant Great Wraps' violation of the Robinson-Patman Act;

(i)    Plaintiffs' reasonable attorneys' fees incurred in prosecuting this action;

(j)    Plaintiffs' costs and expenses incurred in prosecuting this action;

(k)    A trial by jury on all issues so triable; and

(l)    Such further and other relief that this Court deems proper.

This 29th day of December, 2006.

Fellows, Johnson & La Briola, LLP

Steven M. Kushner,
Georgia Bar No. 430510
Thomas K. Wingfield
Georgia Bar No. 770653

225 Peachtree Street, N.E., Suite 2300
Atlanta, Georgia 30303
(404) 586-9200
Fax (404) 586-9201

And

Mitchell J. Kassoff
*pro hac vice* admission pending
Two Foster Court
So. Orange, N.J. 07079-1002
(973) 762-1776
Fax (973) 762-1811

Attorneys for Plaintiffs
Trident Holdings, LLC and
American Consulting Corporation